**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| LORENZO D. C.,<br><br>   Petitioner,<br><br> v.<br><br>THOMAS DECKER, et al.,<br><br>   Respondents. | Civil Action No. 20-4036 (CCC)<br><br>**OPINION** |

**CECCHI, District Judge:**

  Presently before the Court is Petitioner Lorenzo D. C.'s ("Petitioner") motion seeking a temporary restraining order in this habeas matter. ECF Nos. 17–18. The Government filed opposition to the motion (ECF No. 21), to which Petitioner replied (ECF Nos. 24–26, 28). Following an order granting the Government leave to do so, the Government filed a sur-reply. ECF No. 30.  Petitioner thereafter filed a letter on June 12, 2020. ECF No. 34.  For the reasons outlined below, Petitioner's motion is denied without prejudice.

## I. BACKGROUND

  Petitioner is a seventy-seven year old native and citizen of Cuba who first arrived in the United States at Key West Florida in 1980. ECF No. 21-5 at 5.  Upon his arrival at Key West, Petitioner did not have a valid visa or travel document. Id.  Without clear entitlement to enter the country at that time, Petitioner was paroled into the United States on May 23, 1980. ECF No. 21-7 at 4.  Petitioner has remained in the United States since that time.  During his time in the United States, Petitioner has amassed a considerable criminal record including convictions for sexual

abuse in 1989 and 1995, a conviction for the forcible touching of the intimate parts of another in 2014, and pending charges for forcible touching and sexual abuse in New York arising out of his arrest on July 19, 2019.  Id; ECF No. 21-6.  Following Petitioner's release from state pre-trial detention, Petitioner was arrested by immigration officials at his apartment on February 19, 2020, and taken into immigration detention at the Hudson County Correctional Facility (the "Facility"). ECF No. 21-7.  At the time of his arrest, Petitioner told immigration officials that he was "in good health" although he did "have arthritis" and was taking some medication. Id. at 4.

During his time in the Facility, Petitioner has been seen by medical staff on several occasions.  Upon his transfer into the Facility on February 19, Petitioner received an intake evaluation, including an initial screening for symptoms of COVID-19. ECF No. 30-1 at 12–30. Petitioner received additional preliminary medical screenings on February 20, 2020. Id.  As part of these screenings, doctors determined Petitioner to have some musculoskeletal atrophy, arthritis, and a need for eyeglasses and a bottom bunk placement, but found his condition to be otherwise normal. Id.  Petitioner was prescribed naproxen for his arthritis, but reported no history of lung, heart, brain, or other serious medical issues. Id.  A diagnostic chest x-ray taken of Petitioner on February 20 indicated that he had a "modestly enlarged heart" and a "right lower lobe atelectasis," or partially collapsed lung, but found no sign of tuberculosis or other issues. Id. at 35.  On February 23, 2020, shortly after Petitioner arrived at the Facility, he received a routine mental health evaluation which found him to be "alert and communicative [with] no signs" of any clear mental health issues, and Petitioner declined further mental health services. Id. at 6–7.  Throughout his time in the Facility, Petitioner was prescribed and provided pain relievers, skin cream, and topical muscle pain creams to treat his arthritis and pain. Id. at 37–45.

On March 11, 2020, Petitioner reported to the medical department advising of chronic pain, apparently related to his arthritis. Id. at 55.  He was given an examination and provided pain medication. Id.  Petitioner was examined the next day during a follow up appointment, and was found to have clear breathing, a regular hear beat, and no issues other than his knee pain, for which he was provided more pain medication. Id. at 81–82.  Petitioner reported no respiratory distress at that time. Id. at 55.  Petitioner was examined again on April 2, 2020, but denied any flu-like symptoms and had no fever or other sign of illness at that time. Id. at 74.  He was seen again on April 21, 2020, when his vital statistics and breathing were again checked and found to be normal, with Plaintiff complaining of no issues other than arthritis related knee pain. Id. at 72.  On April 29, he received bloodwork related to his arthritis following an examination which showed no signs of medical issues other than Petitioner's complaints of knee pain. Id. at 71, 79–80.  He was next seen by nursing staff on May 5, 2020, when he asked to renew his pain medications. Id. at 69.  His vitals were checked and found to be normal, and he reported no respiratory or breathing issues. Id.  He also received a topical muscle rub for his knee on that date. Id. at 78.  Since April 18, 2020, Petitioner has been placed in a single occupancy cell as a preventative measure in light of COVID-19. ECF No. 30 at 1; ECF No. 30-4 at 2.

In support of his motion, Petitioner has submitted a report from Dr. Amrita Seehra. *See* ECF No. 19-3.  According to Dr. Seehra, who has reviewed Petitioner's records and self-reported medical history as relayed by his lawyer, Petitioner has previously been hospitalized for a stroke, which may have been a result of "uncontrolled high blood pressure" as Petitioner's medical records indicate a systolic blood pressure which has at times been in the hypertensive range. Id. at 3.  Dr. Seehra further notes that Petitioner's intake chest x-ray indicated a modestly enlarged heart and a partially collapsed lower right lung, which "may be a sign of heart disease" or high blood pressure.

3

Id.  The doctor also suggests that the partially collapsed lung could put Petitioner at risk of pneumonia, which he has been hospitalized for in the past. Id.  Dr. Seehra further provides that Petitioner had previously used an "albuterol inhaler" for shortness of breath, but noted that nothing to that effect is contained in Petitioner's jail medical records. Id.  Based on his lung issues, age, self-reported history of hypertension and stroke, Dr. Seehra opines that Petitioner is "significantly more vulnerable to severe symptoms of COVID-19." Id. at 4, 7.

## II.  DISCUSSION

### A.  Legal Standard

Injunctive relief is an "extraordinary remedy, which should be granted only in limited circumstances." *Novartis Consumer Health v. Johnson & Johnson – Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir. 2002) (citation omitted).  In order to establish entitlement to injunctive relief in the form of a temporary restraining order, the moving party must:

> demonstrate that "(1) he is likely to succeed on the merits; (2) denial will result in irreparable harm; (3) granting the injunction will not result in irreparable harm to the defendants; and (4) granting the injunction is in the public interest." *Maldonado v. Houston*, 157 F.3d 179, 184 (3d Cir. 1998) (as to a preliminary injunction); *see also Ballas v. Tedesco*, 41 F. Supp. 2d 531, 537 (D.N.J. 1999) (as to temporary restraining order).  A plaintiff must establish that all four factors favor preliminary relief.  *Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d 187 (3d Cir. 1990).

*Ward v. Aviles*, No. 11-6252, 2012 WL 2341499, at *1 (D.N.J. June 18, 2012).  Petitioner, as the party seeking a temporary restraining order, must first demonstrate a "reasonable probability of eventual success in the litigation." *Bennington Foods, LLC v. St. Croix Renaissance Grp., LLP*, 528 F.3d 176, 179 (3d Cir. 2008) (citation omitted).  To satisfy this requirement, "[i]t is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather, the burden is on the party seeking relief to make a prima facie case showing a reasonable

probability that [he] will prevail on the merits." *Ward*, 2012 WL 2341499 at *2 (quoting *Oburn v. Shapp*, 521 F.2d 142, 148 (3d Cir. 1975) (quotation marks omitted).

To the extent that Petitioner's requested relief is immediate release from detention, the Third Circuit has, in the past, authorized a district court reviewing a state court conviction via a habeas corpus petition to enter an order granting bail pending resolution of the petitioner's habeas claims. *See, e.g.*, *Lucas v. Hadden*, 790 F.2d 365 (3d Cir. 1986).  In *Lucas*, the Court of Appeals recognized that federal courts hearing habeas petitions brought by state prisoners have the "inherent power . . . to admit a state petitioner to bail pending a ruling on the claims asserted in [his habeas] petition," but also noted that this power should only be exercised sparingly. *Id.* at 367. The Third Circuit therefore concluded that likelihood of success on the merits alone will not suffice to warrant release on bail pending habeas review, and a petitioner seeking review must instead show that he faces "extraordinary" or "exceptional" circumstances which warrant treating him differently than others so confined. *Id.* at 367–68.  Although the Third Circuit did not define what constituted an "extraordinary circumstance," it did recognize that one such circumstance was presented in *Johnston v. Marsh*, 227 F.2d 528 (3d Cir. 1955), in which a habeas petitioner requested bail because he was extremely ill and sought release to enter a hospital for treatment unavailable in prison. *Id.* at 366–68.

## B.  Analysis

In his motion, Petitioner argues that he should be released from immigration detention because he has a high likelihood of success on his habeas claims.  Specifically, he asserts that he has been subjected to punitive conditions of confinement without a supporting conviction and that the Facility in which he is detained and its staff have been deliberately indifferent to his medical needs in light of his medical history and the threat of COVID-19.

5

For an immigration detainee to state a claim for relief based on his medical needs under the Due Process Clause, he must show both that he has a sufficiently serious medical need and that jail officials have been deliberately indifferent to that need. *See, e.g.*, *Parkell v. Morgan*, 682 F. App'x 155, 159–60 (3d Cir. 2017); *King v. Cty. of Gloucester*, 302 F. App'x 92, 96 (3d Cir. 2008). Petitioner's claim can only succeed if he can show that Respondents acted with deliberate indifference to that need, *i.e.*, that Respondents "kn[e]w of and disregard[ed] an excessive risk to inmate health or safety." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

In determining whether a detainee's conditions of confinement violate his substantive due process rights, "the proper inquiry is whether those conditions amount to punishment of the detainee." *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979). The Third Circuit has arrived at a two-part test for this inquiry, under which the court "must ask, first, whether any legitimate purposes are served by these conditions, and second, whether these conditions are rationally related to these purposes." *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008) (citing *Union Cnty. Jail Inmates v. Di Buono*, 713 F.2d 984, 992 (3d Cir. 1983)).

### 1. <u>Basis for Detention</u>

Because the potential success for Petitioner's claims partially rests on the nature of the Government's interest in his ongoing detention, this Court must first determine the statutory basis for Petitioner's detention. In this matter, Petitioner was paroled into the United States without being admitted after his arrival at Key West, Florida, in 1980, and is thus an applicant for admission into the United States. His detention therefore arises out of 8 U.S.C. § 1225(b), which "mandate[s] detention of applicants for admission until [removal and/or asylum] proceedings have concluded." *Jennings v. Rodriguez*, 130 S. Ct. 830, 842-46 (2018). Absent a violation of Due Process, detention

6

under the statute is mandatory throughout removal or asylum proceedings before an immigration judge and the BIA. *Id.*  Detainees held under the statute have no statutory entitlement to a bond hearing unless their Due Process rights are violated. *Id.*  Courts in this district have further found that "arriving aliens, like Petitioner, who are denied admission to the United States and taken into custody by DHS at a port of entry are, as a matter of law, deemed to have never entered the United States; instead they are legally treated as if stopped at the border. . . .  As a result, they are entitled to something less than the full array of rights usually conferred by the Due Process Clause." *Tuser E. v. Rodriguez*, 370 F. Supp. 3d 435, 442 (D.N.J. 2019) (citations and quotation marks omitted); *see also Jennings*, 138 S. Ct. at 837 (arriving aliens paroled into the United States "shall not be regarded as [admitted]," and when the Government determines that the purpose of the parole has been fulfilled, "the alien shall forthwith . . . be returned to the custody from which he was paroled and thereafter . . . continue to be dealt with in the same manner as that of any other applicant for admission").  As the Government's interest in implementing its immigration policy relates to the ability to control who is granted or denied entry into the United States, the Government has an interest in detaining aliens pending a determination on their admissibility or removability. *See, e.g., Jennings*, 138 S. Ct. at 837, 843–46; *Zadvydas v. Davis,* 533 U.S. 678, 693-95 (2001); *Demore v. Kim*, 538 U.S. 510, 521-22, 530 (2003).

## 2.  **Conditions of Confinement**

Petitioner first argues that his conditions of confinement amount to unconstitutional punishment without a supporting conviction in violation of the Due Process Clause.  To show a likelihood of success on the merits of this claim, Petitioner must show either that the Facility and its staff acted with an express intent to punish him or that his conditions of confinement are arbitrary, purposeless, or excessive and are therefore unreasonable in light of the Government's

interest in his detention.  *See, e.g., Stevenson v. Carroll*, 495 F.3d 62, 67–68 (3d Cir. 2007).  As discussed above, the Government has a legitimate interest in detaining Petitioner pursuant to Section 1225(b) until his removal and asylum proceedings have concluded.  As Petitioner has not alleged an express intent to punish him on the part of Respondents, he must therefore present facts indicating that his current conditions of confinement are arbitrary, purposeless, or excessive in light of that clear interest in his detention.

Having reviewed the conditions currently in place at the Hudson County Correctional Facility, this Court concludes that Petitioner has failed to show that his conditions of confinement are arbitrary, purposeless, or excessive, and he is therefore unlikely to succeed on his conditions of confinement claim.  This Court reaches that conclusion after considering the numerous concrete steps taken by the Facility to mitigate and alleviate the threat COVID-19 poses to its detainee population in general and to Petitioner specifically.  Since the onset of the COVID-19 pandemic, the Facility has placed its facility physician on call "on a 24-hour basis" and has increased medical staff to ensure that nursing staff is on-site at all times. ECF No. 30-3 at 2. Since March 2020, the Facility has also stopped accepting immigration detainees who were detained at the border, or who were detained inside the United States and "have not been tested for COVID-19 and medically cleared." Id. at 5.  All new inmates or detainees are examined by a nurse during admission and are denied entry if they have a fever above 100.4 degrees and are provided hand sanitizer before entry. Id. The Facility has similarly instituted checks for staff and vendors, all of whom have their temperatures checked outside the Facility and are denied admission if they have a fever. Id. at 6. The Facility has additionally limited or suspended entry into the Facility by guests, volunteers, and tours. Id. at 6–7.

The Facility has also increased cleaning and sanitization, obtained additional supplies, expanded health monitoring of all inmates and detainees, acquired appropriate masks and protective equipment for staff, provided all detainees with surgical masks, handed out increased soap rations, disseminated additional soap and disinfectant wipes upon request, and adopted testing and treatment protocols for detainees. Id. at 5–12.   Pursuant to these protocols, inmates and detainees who show or report symptoms consistent with COVID-19 are "immediately evaluated by medical staff." Id. at 9.   The Facility liberally tests those showing symptoms. Id. Those who test positive and do not require hospitalization are moved to a quarantined detention area and are provided treatment, which can include medication where appropriate. Id.   Those who are symptomatic or test positive are monitored on a daily basis and evaluated for placement in a hospital if their symptoms so require. Id. at 9–10.   Those who test positive or are symptomatic are kept in quarantine for at least fourteen days, and those in this quarantine unit are confined in a manner that permits social distancing. Id. at 10.   Those who are asymptomatic but have been exposed to a confirmed COVID-19 case are housed together and have their movement restricted for fourteen days or until they show symptoms and are moved into quarantine. Id.   Even among those without exposure or symptoms, most detainees have been moved to single occupancy cells, in which they remain for most of the day aside from two thirty-minute periods out of their cells. Id. at 3–5.   Inmates with identified health risks are housed in single occupancy cells and all staff "who work with those inmates and detainees are using full PPE including suits, N95 masks[,] and gloves." Id. at 12.

In light of these substantial steps taken to protect the detainee population in general and those with heightened risk, the conditions under which Petitioner is housed appear to be rationally related to the Government's interest in detaining arriving aliens subject to removal proceedings.

Those conditions are specifically tailored, following Centers for Disease Control and Prevention ("CDC") guidance, to protect the inmate and detainee population from COVID-19 and to mitigate the threat the virus poses to those who become infected.  As the conditions of Petitioner's confinement are rationally related to the Government's interest in detaining him, Petitioner has failed to show that he is likely to succeed on the merits of his conditions of confinement claim. *Daniel R.-S. v. Anderson*, No. 20-3175 (CCC), 2020 WL 2301445, at *7 (D.N.J. May 8, 2020).

### 3. Deliberate Indifference to Medical Needs

Given the medical treatment and monitoring Petitioner has received, as well as the COVID-19 protocols outlined above, Petitioner has likewise failed to show a reasonable likelihood of success on the merits of his deliberate indifference to medical needs claim.  Although this Court is sympathetic to the threats which may be posed to detainees by the COVID-19 pandemic, and acknowledges that Petitioner does have ongoing medical needs, nothing Petitioner has provided indicates that the Facility and its staff have been deliberately indifferent to Petitioner's medical needs.  As outlined above, the Facility has taken numerous steps towards mitigating the threat of COVID-19, including placing Petitioner in a single occupancy cell.  Additionally, Petitioner's medical records clearly indicate that the Facility has been monitoring his health and have repeatedly questioned him regarding any issues with his breathing and have monitored his vital statistics even on those occasions when he has sought medical aid for entirely separate issues, such as his arthritis.  The Facility and its medical department have further provided Petitioner with various medications and treatments for his arthritis, the only medical issue Petitioner self-reported to the staff upon his arrival at the Facility, and have otherwise treated his health issues as they have been raised.  In light of Petitioner's medical records, and the steps the Facility has taken to protect him and the entire Facility's detainee and inmate population, it does not appear that Petitioner will

be able to show that staff recklessly disregarded Petitioner's health or the risks posed to him by COVID-19, and Petitioner has therefore not shown a likelihood of success on the merits of his medical indifference claim.

Petitioner has failed to show a likelihood of success on the merits of the two claims on which he has based his request for a temporary restraining order.[1]  Accordingly, he is not entitled to a temporary restraining order at this time and his motion is denied.[2]  *Daniel R.-S.*, 2020 WL 2301445 at *5–7.

## III. CONCLUSION

For the reasons expressed above, Petitioner's motion seeking a temporary restraining order (ECF No. 17) is **DENIED WITHOUT PREJUDICE**.  An appropriate order follows.

**DATE**: July 14, 2020

_____

**CLAIRE C. CECCHI, U.S.D.J.**

---

[1] As Petitioner has failed to meet his burden with respect to the likelihood of success on the merits, the Court need not address the remaining factors. *See Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017).

[2] The Third Circuit has recently reiterated that the relief available via a temporary restraining order is "ordinarily [limited to] temporarily preserving the status quo," and that injunctive relief going beyond maintaining the status quo, such as the outright release of a detained alien, must instead normally be obtained through a motion seeking a preliminary injunction. *Hope v. Warden York Cnty. Prison*, 956 F.3d 156, 160–62 (3d Cir. 2020).  Because the standard that applies to the grant of a temporary restraining order overlaps with the standard which is applied when a party seeks a preliminary injunction, this Court's reasoning would be equally applicable to the extent that Petitioner's motion is in effect, if not name, a motion seeking a preliminary injunction.  *See Wincup Holdings, Inc. v. Hernandez*, No. 04-1330, 2004 WL 953400, at *2 (E.D. Pa. 2004) ("[T]he standard for determining the applicability of a temporary restraining order is identical to the test for determining the applicability of a preliminary injunction."); *see also Ward*, 2012 WL 2341499 at *1. Based on the analysis provided in the Opinion, this Court finds that injunctive relief is not warranted in this matter at this time.